KELLEY *v.* NORTHERN OHIO COMPANY.

4-7933                                          196 S. W. 2d 235

Opinion delivered July 8, 1946.

Rehearing denied September 30, 1946.

356

Wils Davis, Giles Dearing and W. H. Fisher, for appellant.

James Robertson, J. H. Lookadoo. and J. L. Shaver, for appellee.

Ed. F. McFaddin, Justice. Appellants (plaintiffs below) sought to establish and enforce a trust in certain lands. From a decree refusing the prayed relief, there is this appeal.

The background facts are lengthy. In 1929, Mr. H. Coldren organized a corporation known as the Northern Ohio Company (hereinafter called the "new company") with 1,000 shares of stock issued and outstanding. Mr. H. Coldren owned 998 shares and his two sons, H. L. Coldren and J. J. Coldren, each owned one share. The new company entered into a contract with the Northern Ohio Cooperage & Lumber Company (hereinafter called the "old company") whereby the new company took over all the assets of the old company on consideration that the new company pay all debts of the old company and also pay a certain stated amount to each stockholder of the old company. Shortly after the organization of the new company and the signing of the contract with the old company, Mr. H. Coldren entered into a contract

with his said two sons wherein the father and two sons agreed that after the new company had fulfilled the contract with the old company, then the new company would pay Mr. H. Coldren $72,000 "either in cash or other assets that may be agreed upon"; and the 1,000 shares of stock in the new company would then be owned one-third by Mr. H. Coldren and one-third by each of his said two sons. The $72,000 represented the face value of Mr. H. Coldren's stock in the old company. We refer to this contract as "the April, 1929, contract." It further stated:

"It is further agreed by all parties that each shall put forth his best efforts toward the fulfillment of above named contract, and in the interests of the Northern Ohio Company, and not let side issues interfere with his best efforts."

The new company prospered, and by 1937 had completely satisfied the old company and all of the stockholders thereof except Mr. H. Coldren. One of the disputed questions in this case is whether the new company ever paid Mr. H. Coldren the $72,000 either in cash or "other assets." It is the appellants' contention that certain farms were agreed to be deeded to Mr. H. Coldren in lieu of the cash. We will consider this question presently.

In December, 1937, Mr. H. Coldren transferred 200 shares of his stock in the new company to his son J. J. Coldren and a like amount to his son H. L. Coldren; so that, at all times thereafter during the life of Mr. H. Coldren, the stock in the Northern Ohio Company stood on the books as follows:

| | |
|---|---|
| Mr. H. Coldren | 598 shares |
| J. J. Coldren | 201 shares |
| H. L. Coldren | 201 shares |
| Total | 1,000 shares |

We mention here that if Mr. H. Coldren had transferred the stock to his sons as provided by the contract

of April, 1929, the stock would have stood 333 1/3 shares to each of the three shareholders; but this was never accomplished during the lifetime of Mr. H. Coldren.

On September 1, 1943, Mr. H. Coldren died testate, survived by his three daughters and two sons, being Mrs. Bertha Kelley, Mrs. Chloie Moffei, Mrs. Nora Box, J. J. Coldren and H. L. Coldren. The will of Mr. H. Coldren, dated March 11, 1942, omitting the opening paragraph and signatures and attestation, provided:

"2. I give, devise and bequest unto my son H. L. Coldren 198 shares, and unto my son J. J. Coldren 199 shares of my stock in the Northern Ohio Company. Conditional, however, upon each son paying within one year from the date of my death the sum of $14,400 in equal shares to my daughters Bertha Kelley, Chloie Moffie and Nora Box.

"I give and bequeath unto Bertha Kelley, Chloie Moffie and Nora Box the remainder of my shares of stock in the Northern Ohio Company, they to take equal shares of said stock.

"3. All the rest, residue and remainder of my estate whether real, personal or mixed and wherever situated, I give, devise and bequeath to my daughters, Bertha Kelley, Chloie Moffie and Nora Box and unto my sons H. L. Coldren and J. J. Coldren, they to take equal shares.

"4. Should any bequeathee, or devisee under this will die before me, then any child or children surviving shall take the devised parent's part, otherwise the legacy or bequest shall lapse and become of my residuary estate.

"5. My daughters Bertha Kelley, Chloie Moffie and Nora Box are indebted to me for some money I have advanced to them from time to time, and I anticipate I will make additional advances of money to them. All sums that they now owe, or may hereafter owe me, shall be deducted by my executor from their respective interests herein devised and bequeathed to them.

"6. I direct that all legacy, transfer, inheritance and succession taxes which may be payable in respect to

legacies and bequeaths whether in my residuary estate or otherwise provided for in this will, shall be paid out of the principal of my residuary estate, and I hereby charge the principal of my residuary estate with the payment thereof.

"7. I hereby waive, constitute and appoint my son H. L. Coldren executor of this my last will and testament, to be exempt from giving bond as such.

"8. It is my will that should any beneficiary undertake to contest this my last will and testament in any court that the bequest or devise made in his or her behalf shall at once become void and the property bequeathed part of my residuary estate to pass to the beneficiaries therein provided for."

The will was duly probated and was not contested. H. L. Coldren and J. J. Coldren each paid the $14,400 and received the stock provided in paragraph 2 of the will. The $28,800 was divided equally and received by the three daughters, Mrs. Kelley, Mrs. Moffei, and Mrs. Box, as provided in paragraph 2 of the will. J. J. Coldren died intestate on November 2, 1943, survived by his widow and two minor children.

On July 24, 1944, the present suit was filed by Mrs. Bertha Kelley and Mrs. Chloie Moffei as plaintiffs. The defendants were Northern Ohio Company, a corporation; H. L. Coldren, executor of the estate of Mr. H. Coldren; H. L. Coldren individually; Mrs. Nora Box; Mrs. Sarah G. Coldren, administratrix of the estate of J. J. Coldren; Mrs. Sarah G. Coldren individually; Jerre Jayne Coldren and Jimmy Francis Coldren, minor children of J. J. Coldren, deceased. The complaint alleged that H. L. Coldren, executor of the estate of Mr. H. Coldren, had refused to be a plaintiff so he was made a defendant. In addition to most of the facts hereinbefore stated, the complaint also alleged that in December, 1937 (when Mr. H. Coldren transferred the 200 shares of stock to each of his sons as above stated), it was then and there agreed that the new company would transfer to Mr. H. Coldren

certain lands and personal property in lieu of the $72,000 cash due him under the contract of April, 1929. The lands were described in detail in the complaint and are referred to as the "Chatfield and Long Lake Farms." The personal property referred to consisted of the farming equipment, etc., used on and going with these two farms. The complaint prayed (1) that the new company be held a trustee for the estate of Mr. H. Coldren for said farms and personal property, and (2) in the alternative, that the stock certificates of December, 1937, to H. L. Coldren and J. J. Coldren be canceled and the stock returned to the estate of Mr. H. Coldren.

There were also allegations in the complaint concerning undue influence exerted on Mr. H. Coldren by his two sons, the senility of Mr. H. Coldren in his later years, and also that large sums of money were secreted by some of the defendants; but these allegations (concerning undue influence, senility, and secreting of funds) are unsupported by the evidence: so we pretermit any discussion of them. The main effort of the plaintiffs was the attempt to obtain the Chatfield and Long Lake Farms for the estate of Mr. H. Coldren.

Issue was joined, by all of the defendants denying the allegations of the complaint; and the plaintiffs' evidence consists of the depositions of eleven witnesses and also numerous exhibits. The taking of plaintiffs' depositions was commenced on November 27, 1944, and concluded on January 21, 1946; and at the conclusion of the plaintiffs' evidence the chancery court, on motion of defendants, dismissed the complaint on the ground of the insufficiency of the evidence. This appeal challenges that decree.

I. *Did the Appellants Prove That the New Company Held Title to the Chatfield and Long Lake Farms in Trust for the Estate of Mr. H. Coldren?* The party seeking to prove such a trust must offer evidence more than a mere preponderance. In *Oliver* v. *Oliver*, 182 Ark. 1025, 34 S. W. 2d 226, and in *Fenter* v. *First National Bank*, 182 Ark. 89, 30 S. W. 2d 820, we said that such

evidence must be "clear and convincing." In *Nevils* v. *Union Trust Company*, 111 Ark. 45, 163 S. W. 162, we said that the evidence "must be of so positive a character as to leave no doubt of the fact." In *Aycock* v. *Bottoms*, 201 Ark. 104, 144 S. W. 2d 43, we said "nothing short of clear, convincing and satisfactory evidence will show a trust." Weighing the evidence of the appellants in the scales established by the cited cases, we reach the conclusion that the plaintiffs failed to establish the trust alleged. To review all the evidence in the 400 pages of testimony would unduly prolong this opinion and serve no useful purpose; but here are some of the factors that lead to our determination:

1. On March 7, 1942, Mr. H. Coldren made a financial statement in which he listed as his personal assets "stock in old company, $72,000." This item shows that on March 7, 1942, Mr. H. Coldren still considered that the value of his "stock in old company" to be what he was to receive and not the Chatfield and Long Lake Farms. It must be remembered that the face value of Mr. H. Coldren's stock in the old company was $72,000, and he was to receive that amount before he transferred to his sons their one-third contract interest in the stock in the new company. So on March 7, 1942 (four days before he signed his will) Mr. H. Coldren was not claiming the Chatfield and Long Lake Farms, but was claiming $72,000.

2. Then on February 18, 1943, in another financial statement, Mr. H. Coldren listed as his personal assets "stock in old company (Chat. & L. Lake Farms) $72,000." This quoted line is urged by the appellants as strong proof that Mr. H. Coldren was to get the farms. But we think the quoted line indicates that Mr. H. Coldren recognized that he had only the claim to $72,000. The information in the parenthesis, "Chat. & L. Lake Farms," could hardly mean that the transaction had been finally agreed upon by him and his sons, else the item would have read "Chat. & L. Lake Farms (for stock in old company), $72,000." The very way in which the

entry was worded indicates rather clearly that Mr. H. Coldren recognized on February 18, 1943 (less than seven months before his death), that he did not then have anything but the stock in the old company which he hoped to turn into farm lands by later consummation. That Mr. H. Coldren had tried to get his sons to let him have the farms for the $72,000 seems reasonably clear; but the fact that they had refused is equally as clear. High income taxes, as well as other matters, seemingly delayed the consummation.

3. The will of Mr. H. Coldren (signed on March 11, 1943) shows that he provided how his estate would keep the agreement of April, 1929, with his sons and at the same time give to the three daughters a part of the $72,000; and this will is a most cogent fact against the appellants. At the time he made his will and at the time of his death, Mr. H. Coldren had in his name on the books of the new company 598 shares of stock. By section 2 of his will he provided that H. L. Coldren could have 198 shares by paying $14,400 therefor, and that J. J. Coldren could have 199 shares by paying $14,400 therefor; and that the $28,800 would be divided equally to the three daughters. When these 397 shares of stock (the total of the 198 to H. L. Coldren and the 199 to J. J. Coldren) were deducted from the 598 shares, there were left only 201 shares still in Mr. H. Coldren's estate, and these shares were to go equally to the three daughters. If Mr. H. Coldren had thought at the time he made his will that he had the Chatfield and Long Lake Farms in lieu of the $72,000, then he would have known that he only had 333 1/3 shares of stock in the new company and therefore he could not leave 397 shares to the sons, conditioned on payment, and still have stock left to go to his daughters. The very provision in the will, providing for the disposition of 397 shares to the sons and the remaining shares to the daughters, shows that Mr. H. Coldren considered himself the owner of more stock than he could have owned if he had previously received the Chatfield and Long Lake Farms in lieu of the $72,000 under the contract of April, 1929. This provision in the will shows

that Mr. H. Coldren provided that his sons could get the stock only by paying the amount that Mr. Coldren named. The will is at variance with the contention of the appellants. Thus, the financial statements and the will—documentary evidence—prevent the evidence of the plaintiffs from being sufficient to meet the test required to have a trust declared.

II. *Impossibility of Performance.* There is another reason why appellants cannot recover in this case; and that is because they have by their own conduct rendered it impossible for the contract of April, 1929, to be performed. Before the corporation could be held to be a trustee of the Chatfield and Long Lake Farms, the appellants had the burden of proving: (a) that Mr. H. Coldren and his estate had done all that was required under the April, 1929, contract to be entitled to the $72,000, and also (b) that there had been a definite agreement that the Chatfield and Long Lake Farms would go to Mr. H. Coldren "as other assets" in lieu of the $72,000. (It is not claimed by the appellants that Mr. H. Coldren was entitled to both the lands and the $72,000.)

We revert to (a) above: Even before Mr. H. Coldren was entitled to the $72,000, the appellants had to prove that Mr. H. Coldren was (and his estate now is) ready, able and willing to perform all that was required of him in the contract of April, 1929, with H. L. and J. J. Coldren. By that contract Mr. H. Coldren agreed to transfer to each son 332 1/3 shares of stock in the new company, which with the one share held by each such son in April, 1929, would give each son 333 1/3 shares. There is proof that Mr. H. Coldren transferred 200 shares to each son in December, 1937; but before Mr. H. Coldren or his estate could get the $72,000, he was to transfer to each son 132 1/3 additional shares. This was never done. This performance (transferring 132 1/3 additional shares to each son under the contract) has been rendered impossible because under the will J. J. Coldren had an option to purchase 197 shares and H. L. Coldren had an option to purchase 198 shares, making a total of

397 shares. (For discussion of such option to purchase, see 69 C. J. 1156.) The appellants received from H. L. Coldren and J. J. Coldren two-thirds of the purchase price of $28,800 for said 397 shares of stock. This was all accomplished under the terms of paragraph 2 of the will.

Mr. H. Coldren had at his death 598 shares. When these appellants elected to take their part of the proceeds of 397 shares, the result was that the estate of Mr. H. Coldren was left with only 201 shares, and his estate did not have sufficient shares remaining to complete the performance of the contract of April, 1929. So the appellants, by accepting two-thirds of the $28,800, rendered it impossible for the estate of Mr. H. Coldren to perform the contract of April, 1929. It is well settled that a party who renders performance of the contract impossible cannot be heard to ask for performance by the other party. In *Mo. Pac. Ry. Co.* v. *Yarnell*, 65 Ark. 320, 46 S. W. 943, we said: "The failure of one party to a contract to comply with its terms releases the other party from complying with it." In 13 C. J. 647, the rule is stated:

"*Prevention by Adverse Party—In General.* A party to a contract cannot take advantage of his own act or omission to escape liability thereon, hence where he causes or sanctions a breach, he cannot recover damages for nonperformance or interpose the breach as a defense to an action on the contract. Under this rule performance of a contract is excused when it is prevented by the acts of the opposite party, or is rendered impossible by him." See, also, 12 Am. Juris., "Contracts," § 381.

When the sons purchased the 397 shares of stock under the will, they lost all right to insist on the contract of April, 1929; and in accepting the proceeds of the sales, the appellants likewise lost all right to ask for a performance of the contract by the sons or the new corporation.

III. *Act 257 of 1945.* What we have heretofore said disposes of the issues in this case; but there is one

procedural question which we now discuss so that this opinion will not be considered as an acceptance of the procedure claimed by appellees. Here is the situation. At the close of the plaintiffs' testimony,.the defendants filed a "demurrer to the evidence," saying: ". . . they file said demurrer pursuant to Act 257 of the Acts of the General Assembly for the State of Arkansas for the year 1945; and state that the evidence introduced by the plaintiffs is not sufficient to constitute a cause of action against either of these defendants."

In the briefs and in the oral argument appellees insisted that they did not finally rest their case; and they say that in the event we should reverse the decree, then they would have the right to introduce their evidence on a remand to the chancery court. They cite Act 257 of 1945 as authority for such contention. In affirming the decree we have acted on the assumption that the appellees, by asking for and obtaining a decree dismissing the complaint for insufficiency of proof, waived the right to introduce evidence. We reach this conclusion because we do not give to Act 257 of 1945 the interpretation that the appellees give to it. The said act says in part: "that upon the closing of plaintiffs' . . . proof in any cause . . . in any court of chancery in this State, . . . the opposing party may file a written demurrer *setting forth any of the defenses now permitted by law* to be raised by said pleading . . ."

We think the italicized words above refer to the five grounds of demurrer found in § 1411 of Pope's Digest and not to a "demurrer to the evidence," which is unknown to our practice. The said act means that if, after the plaintiffs had closed their case, the defendants wanted to offer any of the five grounds set forth in § 1411 of Pope's Digest, then the right to file such demurrer had not been lost. The grounds of demurrer set forth in § 1411 of Pope's Digest go to the issue of jurisdiction, capacity, other pending actions, defect of parties, and "that the *complaint* does not state facts sufficient to constitute a cause of action." The position of

the appellees in the present case is that the *evidence* of the plaintiffs did not make a case. It is a *demurrer to the evidence*. In the case of *Grooms* v. *Neff Harness Company*, 79 Ark. 401, 96 S. W. 135, we said "A demurrer to the evidence, as a means of challenging its sufficiency, is unknown to our code of practice." Since a demurrer to the evidence as a means of challenging its sufficiency was not permitted by our practice prior to the adoption of Act 257 of 1945, and since the said act only purports to allow defenses then known to our practice, it follows that the said act does not establish a demurrer to the evidence in equity cases. In law cases, we have a motion for instructed verdict at the close of plaintiff's case; but in equity cases, there is no such equivalent. For a general discussion of a demurrer to the evidence and its particular inapplicability to equity cases, see 53 Am. Juris., p. 338 *et seq.*, "Trials," § 427 *et seq.* 19 Am. Juris., p. 217, "Equity," § 299. 64 C. J., p. 371 *et seq.* And see *Re Peters*, 73 Colo. 271, 215 Pac. 128, 33 A. L. R. 24. *Troll* v. *Spencer*, 238 Mo. 81, 141 S. W. 855, Ann. Cas. 1913A, 276, contains a discussion of the impropriety of a demurrer to the evidence in chancery cases; and in 1913 Ann. Cas. 283 following the reported case there is an annotation on the impropriety of a demurrer to the evidence in an equity case. In 21 C. J. 637, in discussing equity practice, this is stated:

"*After Close of Plaintiff's Case.* Dismissing a bill at the close of plaintiff's case, before defendant presents or rests his case, is not correct practice in equity, in the absence of express provisions to the contrary. The case being set down for hearing upon the bill, answer and proof, if defendant is willing to risk his case upon plaintiff's proof or rather the failure of plaintiff to prove his case, he should submit the case to the court for final hearing, and if he is not so satisfied, he should present what proof he desires or may be able to present."

Therefore, in affirming this case because of the insufficiency of the plaintiff's evidence, we do so on the theory that the appellees waived the right to introduce

proof by moving for a decree, and we do not rest our opinion on any part of Act 257 of 1945; nor do we express any opinion as to the validity of the Act.

The decree of the chancery court is in all things affirmed.