## E. L. KIRKHAM *v.* THE NATIONAL INVESTORS LIFE INS. CO. AND JESS P. ODOM

5-5024 446 S. W. 2d 675

Opinion delivered November 10, 1969

*J. Harrod Berry,* for appellant.

*J. Ted Blagg,* for appellees.

J. FRED JONES, Justice. This is an appeal by E. L. Kirkham from an adverse decree of the Pulaski County Chancery Court in a suit by Kirkham against The National Investors Life Insurance Company and Jess P. Odom, hereinafter referred to as National. Kirkham does business in North Little Rock as Arkansas Salvage Company, and National owns the old Maumelle Ordinance Plant consisting of several thousand acres of land, with fences and numerous buildings thereon, in North Pulaski County.

On March 31, 1967, Kirkham made a written offer to National as follows:

"Gentlemen:

We have inspected the following items at the old Maumelle Ordinance Plant and submit the offer listed below for the purchase of these buildings from the property:

All the cyclone fence except that running east to west along the railroad track and 50' running south on both ends     $2,300

Nine buildings known as the drier line and bearing the following numbers: 320, 327, 335, 343, 350, 357, 365, 372 and 377     $ 450

Building A12 and 711     $ 50

Stable     $ 50

Several buildings in process of demolition (five or more)     $ 50

Two buildings No. 154 and No. 244     $ 100

We will pay National Investors Life Insurance Company the sum of Three Thousand Dollars ($3,-000) on execution of this agreement and will remove these items within one year of date of this agreement or automatically forfeit any right of ownership thereto. It is understood that access of workmen will be granted and that we act as an independent contractor and assume all risks related to removal and being upon the property."

This offer was accepted by National on March 31, 1967.

After the offer was accepted by National, it requested that the stable and chain link fence enclosing same be excluded from the terms of the agreement and on March 20, 1968, the original agreement was amended as evidenced by a letter from National to Mr. Kirkham as follows:

"In response to our telephone conversation yesterday afternoon, I am writing to confirm our agreement concerning your contract for salvage of materials at the Maumelle site.

We have agreed to extend your contract time for two additional months in consideration of the exclusion of the stables and the adjoining 600-700 feet of chain link fence. Thus, the expiration of your contract will be May 31, 1968, instead of the present contract time of March 31, 1968.

Would you please sign and date, on the place indicated at the bottom of this letter, your acceptance of this amendment to your contract."

Mr. Kirkham signed his acceptance of this amendment on March 30, 1968. On June 3, 1968, Mr. Kirkham was denied further access to the premises for the removal of materials under his contract and he filed his complaint setting out that weather conditions had prevented him from specifically complying with the terms of his amended contract and prayed as follows:

"WHEREFORE, Plaintiff prays that he be allowed additional reasonable time within which to remove his property as above; for the temporary order as aforesaid, same to be made permanent on final hearing. Without waiving the foregoing, for damages for defendant's wrongful taking over of his property and for such denial of his rights, for his costs and all other equitable relief."

National demurred to the complaint and Mr. Kirkham amended his complaint alleging that in consideration of his agreement to eliminate the stable and lot fence from the provisions of his original contract, National had promised to give him all the time he needed to salvage and remove the other fence and buildings; that relying on this promise he waited until his time

had almost expired under the original contract before negotiating for a specific extension of time in writing, and in his amendment he prayed as follows:

> "WHEREFORE, plaintiff prays for reformation of the extension on equitable grounds as aforesaid so as to allow reasonable time for removal of his property and prevention of a forfeiture and for equitable reasonable time in any event, and that he be allowed to remove both his property concerned in the contract and his property that is separate from the contract, for his costs, and for all other equitable relief."

At the close of Mr. Kirkham's evidence, National moved for a "directed verdict" which the chancellor treated as a demurrer to the evidence, under authority of Ark. Stat. Ann. § 27-1729 (Repl. 1962) which provides that in any chancery case the defendant may, at the close of plaintiff's case, file a written motion challenging the sufficiency of the evidence to warrant the relief prayed. The motion was granted by the chancellor, and on appeal to this court Mr. Kirkham relies on the following points for reversal:

> "The Court erred in sustaining defendant-appellees' demurrer to the evidence upon the closing of plaintiff-appellant's case because:
>
> The motion was made orally rather than in writing as required by statute, and plaintiff duly objected. § 27-1729, Ark. Stats.; *Thompson* v. *Murdock Acceptance Corp.*, 223 Ark. 483, 267 S. W. 2d 11.
>
> In sustaining the demurrer to evidence at close of plaintiff's proof the Court held he was entitled to recover on one aspect of his case; therefore, the motion to dismiss should not have been upheld, *McGuire* v. *Benton State Bank*, 231 Ark. 608, 331 S. W. 2d 258, (concurring opinion); *Arkansas State Highway Comm'n* v. *Scott*, 238 Ark. 883, 385 S. W. 2d 636.

The evidence clearly sustained plaintiff's complaint. *Werbe* v. *Holt,* 217 Ark. 198, 229 S. W. 2d 225; and substantive authorities detailed in brief.

(1)   The evidence showed excusable delay because of the unusual weather during the 2-month extension, even if not considered an Act of God.

(2)   Appellant's failure to remove his property within the original term and extension is excusable, having been caused in the first instance by the conduct of Appellees.

(3)   Appellees, along with (2), are estopped by inequitable conduct from insisting upon a forfeiture of Appellant's rights to his property and he should have reformation of the extension to allow reasonable time for removal of his property."

We are of the opinion that the chancellor did not commit reversible error in granting the oral motion under the facts in this case. We find no substantial evidence to support a prima facie case in favor of Mr. Kirkham.

Ark. Stat. Ann. § 27-1729 (Repl. 1962) as originally enacted (Act 257 of 1945) provided "that upon the closing of plaintiff's . . . proof in any cause . . . in any court of chancery in this state, . . . the opposing party may file a written demurrer *setting forth any of the defenses now permitted by law* to be raised by said pleading. . ." (Emphasis supplied). In *Kelley* v. *Northern Ohio Co.,* 210 Ark. 355, 196 S. W. 2d 235, this court held that the above italicized portion of the 1945 Act referred to the five grounds for demurrer set forth in 1411 Pope's Digest (Ark. Stat. Ann. § 27-1115 [Repl. 1962]) and did not permit a demurrer to the *evidence.* The statute was amended by Act 470 of 1949 (Ark. Stat. Ann. § 27-1729 [Repl. 1962]) and now provides that the defendant

"May file a written motion *challenging the sufficiency of the evidence to warrant the court to grant the relief prayed for on the record existing.*" (Emphasis supplied).

We first held in *Werbe* v. *Holt,* 217 Ark. 198, 229 S. W. 2d 225, and more recently in *Lafayette Co. Ind. Dev. Corp.* v. *First Nat'l Bank,* 246 Ark. 109, 436 S. W. 2d 814, that what the motion now challenges is "the sufficiency of the evidence to warrant the relief prayed." The word "written," as applied to the demurrer under the 1945 Act, was carried forward as to the motion in the 1949 Act as amended, but we have never held the *written* demurrer to be mandatory in every case on any of the five grounds under the 1945 Act, and we have never held the granting of an oral motion under the present statute to be reversible error because the motion is presented orally rather than in writing.

In *Thompson* v. *Murdock Acceptance Corp.,* 223 Ark. 483, 267 S. W. 2d 11, and *Cunningham* v. *Chamblin,* 227 Ark. 389, 299 S. W. 2d 89, cited in Mr. Kirkham's brief, we did hold that the appellants had waived their objections to the motions not being in writing by failing to object for that reason at the time of trial. In the case at bar National moved for a "directed verdict" at the close of Kirkham's case and in granting the motion the chancellor said:

"I am going to find for the Defendant on the grounds that there was no fraud. I don't see anything there to require reformation. There is only one thing I do see that those poles they put out there that were left there belong to him. Certainly they have a right, and I believe it's stated here, by agreement or statement, stipulation rather, that they certainly are entitled to go get the poles. I presume they are still there. If they are not I would say they would give him whatever the value of the poles were. What he paid for them and cost of putting them there."

The record then appears as follows:

"MR. BERRY: We are asking for the relief that we have prayed in the complaint and all we are entitled to under the complaint and we are not waiving any of that. Now also I would like to point out to the court that there has been no written demurrer filed at the close of evidence here and I am objecting also to the court's ruling on that basis.

THE COURT: All right. He asked for a ruling in his favor without presenting proof and you had rested your case so I took it, I just made the ruling.

MR. BERRY: We have rested the case. I raise that objection, there is no written demurrer, no written motion to dismiss on the evidence.

THE COURT: I am granting it on his oral motion."

We are of the opinion that in the enactment of § 27-1729, supra, the Legislature intended to provide the same rule in chancery cases as applies to directed verdicts in law cases. We are of the further opinion that it was not the intention of the Legislature to make the relief provided by the statute, dependent upon the motion therefor being in writing; especially when the motion, and the reasons therefor, are clearly understood by the parties and no prejudice to the plaintiff appears by the motion being oral. It would be placing form above substance to require National to put its motion in writing before the chancellor could properly grant it under the state of the record in this case, and we find no prejudice to Mr. Kirkham by the motion being oral rather than written in the case at bar.

The property "separate from the contract" referred to in Kirkham's amendment to his complaint consisted of light poles he had purchased from Arkansas

Power and Light Company. The poles had been removed from the ground and were stacked on National's premises when Kirkham was denied entrance to the premises and the chancellor held that Kirkham was entitled to remove the poles. This right was not denied but was actually agreed to by National. The chancellor's order pertaining to the light poles was not such partial recovery as to prevent the chancellor from dismissing the cause of action sued on by Kirkham. The light poles were not involved in the contract between Kirkham and National and the concurring opinion in *McGuire* v. *Benton State Bank*, 231 Ark. 608, 331 S. W. 2d 258, cited in Kirkham's brief, is not in point. In *McGuire* a third party was brought into the lawsuit and justiciable issues remained to be tried between two of them after a demurrer to the evidence was sustained as to one of them.

In *Werbe* v. *Holt*, supra, where the effect of Act 470 of 1949 was first considered and distinguished from the 1945 Act, this court said:

"What, then, is the effect of a demurrer to the evidence or a similar pleading in jurisdictions recognizing that practice? The question may arise either in equity cases, where the chancellor is the arbiter of the facts, or in cases tried at law without a jury where also the trial judge decides all issues of fact. By the overwhelming weight of authority it is the trial court's duty, in passing upon either a demurrer to the evidence or a motion for judgment in law cases tried without a jury, to give the evidence its strongest probative force in favor of the plaintiff and to rule against the plaintiff only if his evidence when so considered fails to make a prima facie case."

We are of the opinion that the chancellor did not base his opinion in the case at bar on the preponderance of the evidence, but that he based it on Mr. Kirkham's failure to make out a prima facie case. No fraud was

alleged and none was proven in this case and we agree
with the chancellor that no cause was shown for reform-
ing the contract of the parties.

Mr. Kirkham testified that a Mr. Robinson from
Malvern first purchased most of the property and let
his contract expire.

"A.   * * * Mr. Robinson, as a company or an in-
dividual, I don't know which, bought the ma-
jority of this stuff and he sublet some of the
contracts or the demolition of these buildings
and I bought material from some of these sub-
contractors and, of course, I became interest-
ed in the thing. These people told me that
they had stopped them from going in there,
wouldn't let them go in any more and get the
material out, so I was interested in acquiring
this, so I called National Investors and I was
referred to Mr. Joe Hill as being the one in
charge of the property out there and. . .
* * *

A.   * * * I told him I wanted all the brick out
there, which I didn't include in my written
contract. * * * And some other stuff we men-
tioned and he said, 'Mr. Kirkham, let me put
it this way, all this stuff has been sold and
paid, but they defaulted, didn't come in and
remove it, their time ran out. . .' "

As to the oral agreement, Mr. Kirkham testified that
soon after he entered into the original contract he had
a conversation with Mr. Hill:

"We raised the subject about the stable and horse
lot and he said he would like to keep it. He said his
boss wanted to get some horses and put them out
there.
* * *

. . . [T]he stable was a building, as well as I re-

member it was about 24′ wide and oh 40, 50′, which was movable and we were selling those movable buildings out there and we had one similar we sold for $300.00. \* \* \* It was narrow enough to move and low enough roof to be moved and we were selling buildings to be moved. \* \* \* In the conversation I was reluctant to relinquish them to him and finally Mr. Hill said, 'Mr. Kirkham, I am going to get tough with you to get this back; my boss wants it and I am going to get it if I can.' I said, 'I don't know what you mean by getting tough.' He said, 'You have a lot of stuff out there yet, haven't you?' I said, 'Yes, you gave me written permission for my men to go in and take it down.' He said, 'Yes, I understand, we can make it hard on you.' I said, 'Well, I am sure you can' so our relationship had been very fine up to this point, I thought, and I go along to try to satisfy, and the only thing he offered me was additional time for—to relinquish this stuff, so I said, 'Now, what are you talking about in the way of time, how much time do you mean,' and he said, 'All the time you need.' The very words he used. I said, 'Well, as far as the way we are going now I won't need any additional time but if you want to do that, take those items back, we can cut our force and cut our expenses considerably.' He said, 'All right, if that's satisfactory, that's the way we will do it.'

\* \* \*

THE COURT: Is there something in writing to substantiate—the reason I asked the question, this witness now starts talking about extension of time.

MR. BERRY: Yes.

THE COURT: Is there something in writing relevant to that extension?

MR. BERRY: Yes, your Honor, it did come along at a later period of time.

THE COURT: Do you have that in writing?

\* \* \*

MR. BERRY: Yes, your Honor, the extension; yes sir.

THE COURT: Otherwise I might not allow him to continue.

MR. BERRY: Well, your Honor, there is a later writing on the extension. Our proof on that was and we feel we have a legal authority to support us all the way, was that that extention, he had no alternative but to accept that extension and that by the inequitable conduct—we should have had an opening statement on this. We are showing, your Honor . . ."

As to the extension amendment to the original agreement, Mr. Kirkham testified:

"Q. When did they come up then with the two month situation?

A. As well as I remember the letter was dated March 20. I don't remember when I received it. I didn't receive it immediately. I think it was two or three days, maybe even four or five days elapsed between the time it was dated and when I received it, and I was still reluctant to go ahead and sign it after the conversation we had had on the telephone. I kept on turning over in my mind the possibility of suing them or enjoining them to keep them from barring me from the area out there.

Q. Uh-huh. All right. Now, I hand you here a letter from Mr. Naylor, bearing the date of March 20 and bearing your signature date of March 30, 1968, and ask you if that is the letter that you were referring to?

A.  Yes. * * * He just called me and asked me if I was going to sign this letter. * * * And I said that I was. This was just before I did sign it. I said I was going to sign it and I signed it and put it in the mail. * * * I carried some men out there to show them the buildings and they wouldn't let me in and they told me I would have to call Mr. Naylor * * * I told him I come out to show some buildings to some people, prospects I had to sell them to, I wanted to take them in there, and he said, 'Well, I hadn't signed the contract yet and he wouldn't let me go in,' but I said, 'I have signed it and put it in the mail.' He said, 'Well, he hadn't received it.' I assured him I had signed it and it was in the mail and then he told the guards I could go on in. * * * I was desperate, I didn't have any other recourse, had to sign it or they wouldn't let me in.''

Mr. Kirkham testified that in October, 1967, he sold his interest in the contract to third parties who defaulted in their contract with him and he had to again take over. He testified that he was never released from his own contract with National:

''I sold certain buildings and structures to these other people. The provision was that they would take them down and remove them from the property. . . I sold out to them. That's common practice in this type of thing.''

Mr. Kirkham prepared the offer and acceptance constituting the contract entered into on March 31, 1967. He knew at the time he made his original offer that Mr. Robinson from Malvern had originally purchased some or all of the buildings under a similar contract and had forfeited his rights to them because of his failure to re-

move them within the agreed period. "Their time run out." Mr. Kirkham testified that the verbal agreement for all the additional time he needed to remove the nine miles of chain link fence and at least 18 buildings, was entered into in consideration of his verbal relinquishment of claim to 700 feet of chain link fence and one movable stable building 24 feet wide by 40 or 50 feet long for which he paid $50. He says this second agreement was entered into verbally about two months after March 31, 1967. The price Mr. Kirkham paid for all the items listed in the contract, as compared with what he says was their "retail" value and what he lost in profits, is indicative that the prime consideration, insofar as National was concerned, was getting the buildings and materials removed from the premises.

The record does not disclose the amount or nature of the materials Mr. Kirkham actually did remove from the premises during the 14 months he operated under the contract as amended, but his testimony strongly suggests that he was simply taking prospective customers onto the premises and attempting to sell the buildings as they stood without having to wreck or remove them. There is no evidence in the record that Mr. Kirkham himself ever removed a single one of the buildings from the premises. "We sold right from where they were. They went in and got them." Mr. Kirkham insisted that the verbal agreement for an extension of time be reduced to writing and this was done. The agreement was reduced to writing on March 20, 1968, as an amendment to the original contract. The amendment provided for a two month extension of the original contract; Mr. Kirkham accepted the extension and defaulted under its terms. He says that weather conditions prevented his full compliance, but weather conditions were not excepted in the written agreement or in the written extension. Mr. Kirkham says that he knew he would be unable to remove all the materials within two additional months when he accepted the amendment to his contract, so it would appear that if he relied as heavily on

the verbal agreement to give him all the time he needed, as he contends that he did, he would have brought his court action when he was first barred from the premises at the end of one year, rather than accepting a written amendment to the original contract and then bringing his action when the additional time provided in the amendment had also expired. Mr. Kirkham simply did what he knew Mr. Robinson had done—"He let his time run out."

The decree of the chancellor is affirmed.